Thank you both for your oral argument presentations here today. The next case set for oral argument is Earth Island Institute v. Cicely Muldoon. Good morning. Tom Bierschell for Appellant Earth Island Institute. May it please the Court, I hope to reserve five minutes for rebuttal. This is a case about fire, more specifically wildfires in one of our nation's most cherished national parks. Wildfires are scary and dangerous. They can kill people, destroy buildings, homes, and other infrastructure, and the most severe fires can sometimes even kill giant sequoias. But these facts actually underscore the second equally important thing that this case is about. How should a federal agency decide how to address the risks and other impacts from wildfires in a national park? Earth Island filed this lawsuit challenging two projects that purport to address the risks of wildfire in Yosemite National Park because it believes it's essential that our public agencies make the best possible decisions about how wildfire should be addressed in national parks. The agencies that mismanaged our public lands in terms of wildfire for almost a century should not be making critical decisions regarding future and current wildfire management almost entirely behind closed doors. I think we're familiar with some of the broader aspects of this litigation. I had some questions on the impact of the project. Can you explain the significance of increasing the thinning trees from 12 inches to 20? I think it was 20 inches. It was hard for me to determine how many more trees would be cut or what's the combination. Your Honor, that actually is in my outline one of the facts I wanted to point out that is missing. We don't even know how many trees they're going to cut under that change. We think it's quite a few, but we don't even know those basic facts because there, in fact, was never any site-specific analysis of that change. They simply said they explained why they were going to do it, but they didn't explain what the impacts would be, which is critical. And the impacts of that change could be quite significant. The science that we pointed the district court to about there is a real scientific controversy about whether logging to reduce fuel buildup, especially logging larger trees, actually works. And a lot of this most recent science, this was discussed in the bark case, talks about how opening up the canopy and exposing the forest floor from this thinning actually causes more severe fires. And that's the controversy that was at issue at bark. So the impacts here are real and needed to be analyzed, and they weren't. If the Park Service strictly followed the 2004 fire management plan and only thinned the trees that were 12 inches in diameter, would you still be able to bring this suit? I actually think we would, Your Honor, because one of the things we point out is the 2004 plan is a programmatic document. It doesn't actually analyze site-specific impacts. It's a typical management plan that we often see from the Forest Service. It identifies areas where certain types of activities should occur or could occur. It identifies techniques, but it actually doesn't say, and this year you should do X, Y, and Z in this area of the park, and these are the impacts. And so when the Park Service decides that they're going to implement the 2004 plan, for example, within Merced Grove, they would need to do a site-specific analysis before they do that. There's no site-specific analysis about logging within Merced Grove in the 2004 plan. But it did talk about the specific areas, didn't it? It's not just general the way some of them are. I agree with you, Your Honor. It is specific about areas, but again, sometimes it's zoning, sometimes it's this specific area. But identifying an area is different from looking at the impacts, and again, there's nothing about. It says Merced Grove is one of the three special use areas, the three special sequoia groves, but there's nothing about what are the impacts within Merced Grove. In fact, the language of the plan indicates there are certain things that they're going to need to look at before they do it, aesthetic impacts, for example, and they say there are differences between the groves. Merced has very steep slopes and things like that that require site-specific analysis before you go in and do these things. And it says logging trees up to 12 inches, but how many and where and how? Well, I thought the where is generally at least in there, as I think your response to Judge Friedland's question was, were they required to give you a number of trees that they were going to cut? I think in a site-specific analysis, especially in a sequoia grove of this size, they would at least have to estimate it, you know, this is the number of large trees. So they have to say, you know, 150 versus 151, probably not. But they should at least give an estimate of how many large trees are they taking out. That's going to tell us how much impact is it going to have on opening up the canopy, for example. And you're saying they should – I'm sorry to interrupt, but they should have told you that because it's a change or amendment? I think they should have told us that both if they hadn't changed it, because, again, this is implementation of the plan. But also they should have told us that for the change. There are actually two different things going on with the CE. They're both using it to implement the plan, and they're using it to make what they call a change to the plan, although we challenge whether it's an actual amendment to the plan. And so – and I'm sorry if I interrupted you from answering Judge Bennett's question, but I wanted to find out at the outset, you know, how do we define changes or amendments to an approved plan? Because it looks like no other court has really done so. And so I guess I wanted to make sure I asked you, as I will ask your colleague, how we should define change or amendment. Certainly. Well, for example, if this were an actual amendment to the plan, it would change the 12 to 20 inches for all three Sequoia groves. It doesn't do that. It just says we're going to do this just for this project in the Merced Grove. That's not an amendment to the plan. Well, what about amendment tells you that you can't just do a smaller amendment? I don't understand that argument. It's not – plans are supposed to be comprehensive documents, and they're just doing what's, you know, the very site-specific decision here, so it's not really an amendment to the plan. But even if it were an amendment, they still need to look at the impacts of it. So I'm just reviewing my notes about the actual – what you're calling the programmatic plan, the earlier 2004 one, and I think it did look at environmental impacts because it had alternative A and B, and it talked about the environmental impacts of each. So how are you saying it doesn't have environmental impact analysis? I didn't say that, Your Honor. I said it doesn't have site-specific analysis. But it's about specific sites, so isn't that just, like, semantic? I mean, it's – I actually – I'm sorry. I don't understand. It's talking about specific sites and doing an environmental analysis, so that seems like it's doing an environmental analysis of the sites. I would disagree with that, Your Honor. It says the Merced that's three sequoia groves are special use areas. You can thin in these areas up to 12 inches, but it never talks about what the impacts are going to be of actually doing that when they actually do it. That analysis is not there. When you say – I'm sorry. Maybe I'm misunderstanding you. When I read this, they're talking about what will happen if they don't do this, and what their view is what will happen if they do, that it'll be safer, there'll be less fires, the sequoias will be protected. I mean, that may not be right, but that's what they've said. They've said we're talking about, as I understand it, 2.56 extra acres, and it's 209 feet from the road instead of 200 feet from the road. So what about that isn't an analysis? Well, first of all, that analysis is not in the EIS, the FMP, and it's not in the CE. It's in their declarations that they filed after the fact, their post-litigation declarations. There should have been an analysis at the time they made the decision, at a minimum, that supports whether or not their argument that this is going to make the grove safer. And, again, I think there's a real scientific dispute about that, whether logging the larger trees within the grove. And, again, Your Honor, this would be an example of analysis that's not in the plan. This is new science that's come out that talks about how logging these larger trees actually is not the best way to deal with fire. And you should be doing things like, and the 2017 amendment actually made this change, focus on the community infrastructure protection strategies, what they call it, focus on the structures and things like that. And that was also an example of an actual amendment. The 2017 changed the whole plan and said this is what we're going to do. That's an amendment. They used the CE for that. I think this was a proper use of that CE. Can I ask you, because I tried to figure out your allegations about this controversy, and I was looking at the Hansen declarations, which I think are what you used for describing this. Yes. And the Hansen declarations talk about this being controversial, but what they're citing, as far as I can tell, are studies that are about clear-cutting or logging that are used without fire. And I think this project is supposed to be pre a prescribed burn. So it seems like Hansen is, like, pointing to one type of activity and saying there's controversy when the service is saying we're doing a different type of activity. Can you respond to that? Yes. I think that we cite articles about both types of science and activities. But the first issue is whether or not the park service is arguing that they need to take the trees, cut the trees first before they can do prescribed burning. We just fundamentally disagree with that, that they could do the prescribed burning without doing that. And by doing what they're doing, they're going to actually make future wildfires, even if they do do prescribed burns, more severe because they're opening things up. I think you were pretty misleading in how you're characterizing, like, what you're talking about because there's lots of cites to articles. The letters are citing things that are about logging without burning. And then this is a project that's about logging and burning. So I just don't understand how those cites were helpful to us or relevant. I think they're relevant because they deal with the first step, which is the logging, and that the logging, one, is not necessary before they do the prescribed burning, and it actually exacerbates the situation. Well, I don't think the article said that, though. What they said is if you only do logging, it's not a great idea. But that's not really responsive to the idea of whether it's better to do logging and burning. I think we did cite articles that talk about both those things. Can I ask you another question, then? Certainly. Okay, so sometimes we have cases where environmental groups are suing the government, basically saying that the government has the wrong goals. Like maybe the government is focusing on commercial logging and helping commercial logging, and we want you to focus on the environment. My understanding here is that the Park Service is trying to prevent fires and save the forest, which I think is your goal, too. So am I right that we're not in a situation where you think the government is pursuing the wrong goals? The only issue is whether you agree with the science they're using to pursue the same goal you have? Yes. We agree that the Park Service should be doing things to address wildfire. We're starting from a situation where the government has been doing the wrong thing for about 100 years, and we would agree that there needs to be steps taken to address that. I would say it's more than just disagreeing with the science. There's a process issue here, too. This needs to be in public, and the scientific controversy shouldn't be dealt with behind closed doors. I mean, that was the issue in Bark, that there needs to be a public discussion, and the Park Service needs to at least acknowledge this controversy. But your proposed injunction would have allowed them up to the 12 feet, right? Absolutely. So, again, this I think goes to Judge Freeland's question. It's like a lot of the dispute is over the delta between 12 and 20. I would agree with that, Your Honor. Again, we tailored our injunction specifically because, as I started off, we agree wildfire is a serious situation. But that means you agree we're looking at whether the district court abused its discretion, right? Yes. I'm sorry. No, go ahead. In 2004, I guess, I think this is related to what you were just arguing, during the notice and comment period, the Park Service considered public concerns that thinning trees may increase the risk of severe fires. It seems like you're trying to relitigate the 2004 plan's conclusion. Is that what you're doing? No, Your Honor. Again, the injunction here is to change the increase in the size, but it also is the plan did address whatever the science was in 2004. If you look at the government's declarations defending this, they're citing science, extensive science, and it's almost all post-2004. So there's been a lot of changes that have happened. And when you're implementing a plan like this, I think there is an obligation to at least acknowledge that some things have changed scientifically on the landscape. That's one of the extraordinary circumstances for using a categorical exclusion in scientific context. The other question I was trying to get at, though, is we have deference to agencies, especially about science, right? We are not scientists. So shouldn't there be even more deference when the challenger isn't saying, like, the agency has the wrong goal or is interpreting the wrong thing? I mean, here it's like you all have the same goal. The agency is, I think, doing the best it can with the science. Now, you might think they're incompetent, I guess, but, like, how – I mean, we are supposed to defer to them. So do you agree they're doing the best they can at this point to stop fire in Yosemite? No, I don't agree, Your Honor. Again, they didn't do this, like, in an emergency situation. They started this planning for this specific project in 2019. They had plenty of time to do a public process to let people comment on this, to actually do an analysis of the science to make sure they're doing this right. But, like, is there any reason to think that they are choosing to use less good science on purpose? I actually think yes. What is the reason they would do that? Well, you see in the declarations they seem – using logging to address fire is now the primary rationale that the Forest Service and the Park Service use for logging. So if you're real, then maybe you really are still saying the agency is trying to promote commercial logging. I mean, you called this commercial logging, and they say this isn't commercial logging. So I want to ask both sides about that. But, like, it seems like they're saying it's not. And so is that really what you're saying? Actually, they don't have the right goal? They're trying to help logging companies? I don't think that's their only goal here. But they are – again, they're following the Forest Service's science, and I think that is part of what the Forest Service does. The Park Service is primarily following Forest Service science. This is the way you should do this. And there's quite a few scientists that just fundamentally disagree with this approach. Whether or not they were selling the trees, we would still be here. But so I guess I get back then to the idea of why in the world would they not be doing the best job they can to save Yosemite from fire? Your Honor, I would like to ask them that question myself, and we didn't get the chance to submit any comments because there was no public analysis. And my clients are very frustrated that when they did this, they simply checked the box, no controversy about the science, when in fact they were well aware of the controversy. As their declarations say, they were prepared to respond to my clients and say things about we knew about this and we just disagree. But – and again, this comes back to the Bark case. Disagreeing with science is not a basis under NEPA for just ignoring it and pretending that you don't have to address this. And they never did address it at the time. Isn't what we're talking about here, though, increasing instead of from 12 to 20 inch, the trees that are 20 inches, that add now 9 feet to the roadways in the two projects in question? Is that correct? Your Honor, on the roadways, I would disagree with that because, again, there's never been a site-specific analysis of this logging along the roads. And the aesthetic impacts alone are shocking when you see what they're doing. We put some pictures in of what – and these are some of the most scenic roads in Yosemite. And the 2004 rod for the plan actually says aesthetics have to be evaluated on a case-by-case basis, in other words, a site-specific analysis before they do this. But are the two – it seems like, though, you have to balance the aesthetics with the fire safety, correct? Yes, I agree with that. So are the two projects here using fire management techniques that the 2004 plan did not contemplate? It contemplated the techniques, but it didn't contemplate the impacts of using them in these specific areas. And I think they needed to do that so that we would have the opportunity and people would have the opportunity to see what are the impacts of doing this along these incredibly scenic roads before you do it. Well, it seems, though, like that was discussed previously. So you had Dr. Hansen and then Dr. Della – Della Sia? Della Sala. Della Sala. And, I mean, all the techniques seem to have been aired out at that point. And so that's why it seems like you're kind of reaching back and trying to relitigate this issue. Those were comments that were put in during the litigation, Your Honor. Those weren't comments from the 2004 discussion or the CE. This was done with a CE with no public process. We've never had the chance to put in science or comments on this before we filed a lawsuit. And that's really our bottom line here is NEPA requires a public process and public information about this. The 2004 plan in EIS that we keep talking about is still not publicly available. It's not posted on their website. When we first found out about this project, one of the toughest things we had to do was try to figure out what they were doing. And we had to file a FOIA lawsuit, and we didn't even get the plan until we sued. And then they gave it to us, and it's still not on their website. But we have it now. We have it now here. But, again, part of NEPA is informing the public, and you shouldn't have to sue to inform the public, which is what's had to happen here. You're well beyond your five-minute reserve. Do you want to reserve the balance of your time? Okay. May it please the Court. David Frankel on behalf of the Federal Appellees. So I'd like to pick up on the idea of what the Park Service's goal is here because the Park Service's goal is very simple. The Park Service has a single mandate, which is to protect Yosemite Park, which is to protect some of the nation's most valuable and most iconic natural resources for this generation and for future generations. And right now we're in a situation where there are imminent and extreme fire risks. And in the last three years alone, we've seen a decimation of the sequoia population. Twenty percent of all sequoias have been killed by wildfire in the last three years alone. Even during the short course of this litigation, the Park Service's efforts doing the exact same work as challenged here were critical to containing the Washburn fire, for example, giving the firefighters the safe foothold that they needed to protect the community of Wawona, to protect Mariposa Grove. And I do think it's helpful to disentangle the different strands of the argument here. So we are looking at review of a preliminary injunction decision, and the standard is abuse of discretion. And there are merits arguments, but there's also equities arguments. And to prevail in this case, they have to show that the equities favor their position. Counsel? Just so I want to be straight on one fact, I believe I took from the briefing that at the time of the briefing, the first prescribed burn was scheduled for the fall of 2023. Is that still the factual case? That is still the factual case. The prescribed burn will go ahead in fall of 2023. Do we know any more details about when in the fall? So at this point, unfortunately, the Park Service's work in Merced Grove was halted by early season snowstorms early and anticipated. There is still thinning work to be done. Because of mitigations in place to protect the Pacific Fisher, the Park Service can't begin work in Merced Grove until July 1. At that point, they estimate that there's potentially six to eight weeks of thinning left, at which point there's some additional things that need to happen. There's some piling work. There's some drying work. But the Park Service's plan would be able to do in September or October of 2023. Thank you. Can you explain the significance of increasing thinning trees from the 12 to the 20 inches diameter? I'm trying to get a sense of the scale. How many more trees will be cut? Of course. And I'll just start with the reason here. In 2004, when the fire management plan was introduced and vetted in the 812-page environmental impact statement, the conditions in Merced Grove were such that the agency believed that thinning 12-inch trees would be enough. And the fact is that since that point, that the grove has gotten substantially more dense, and also the danger is obviously more imminent. But what's driving the decision is the increased density in the grove since that point, where the Park Service believes that the grove will not be in safe shape. It will not be sufficiently safe. If a wildfire should happen to come during this fire season, it would not be safe for the prescribed burn. It would not give the adequate level of safety to protect firefighters during a prescribed burn if they were unable to thin the 12 to 20-inch trees as well at this point. What are we talking about? What's the scale we're talking about? You know, there's not a particular number of trees. I mean, these are all younger trees. So the average tree size in Yosemite is 21 inches in diameter. So largely what we're talking about is trees that are smaller than average as a whole. You know, I will say that these trees, one of the reasons why thinning trees in this delta from 12 to 20 inches is necessary is because these trees reach higher up. And the density of trees that go higher up that are closer to approaching the forest canopy, where sequoias are at just extreme risk if fire ladders its way up these trees and reaches the crowns, that's the point where sequoia fatality becomes a high percentage, and that's the point also where firefighters become seriously injured. As I understand it, another, I mean, looking at reason in a different way, is because what's happened over the past number of years, as I understand it, has been less action than the no-action alternative. That's right. You know, it is unfortunate that the Park Service has not been able to do nearly as much work as it hoped in the 2004 fire management plan. And, you know, one big piece of that is there's just not been a dedicated funding stream for this work. And so what that means is that the Park Service has to rely on things like public grants and donations to cover the cost of these projects, and it, frankly, has been slower than hoped. I mean, and there's been a couple other factors in the last decade or so that have really further stalled the work, one of which being this once-in-a-millennium drought that has just littered hazard trees, dead and dying and fallen trees across the park, and required the Park Service to devote really a limited amount of resources to dealing with that, as well as these active fires that have raised across the Sierra Nevada for the last five years. You know, it's some of the same people who are doing this prophylactic work as that are called out to fight active firefighters. And so the point right now is that there is this moment. There is this moment where the Park Service has the resources, where the Park Service has the personnel to do this critical work. And to find, you know, at least, you know, again, I think it's helpful to sort of separate the equities from the merits, and plaintiff needs to prevail on both. But at least for the purpose of the equities here, to find that the equities favor the Institute requires essentially disbelieving the Park Service's expert view of the risks and rejecting the Park Service's on-the-ground understanding of what's necessary to protect its parks. And that understanding, among other things, has been informed by the trial by fire that's happened over the last five years. You know, I'll give one example. In the 2021 Windy Fire, responders were able to enter a sequoia grove before a fire and were able to do thinning and biomass removal around four sequoias. In a grove of over 100 sequoias, after the fire swept through, there were four sequoias left standing, and those were the ones that they were able to use these techniques to protect. So I'm going to ask you the same question that I asked your friend. It appears no other court has defined change or amendment to an approved plan, and so I'm trying to figure out how we should define change or amendment. Sure. Do you have a suggestion? So the Sauk Prairie case in the Seventh Circuit did get at this a little bit, and I think what I would suggest is that there's a couple limiting principles here. So one limiting principle would be that it has to be consistent with the purposes and aims of the plan. So it can't just be, oh, we're doing something minor. It has to be we're doing something minor that is right within the plan, and what they're doing here, the minor changes that they're affecting to FMP-authorized work, are right in the heart of the plan. They are designed to protect the park with the exact same methods and technique that were entirely studied in 2004, and the small additions are just really small alterations to that work necessitated by changed circumstances. The second limiting principle that I would say is it has to be commensurate in scope. So if a plan was this purely programmatic document that had no analysis of any sites at all, I think at that point you would run into trouble trying to use this changes or amendments provision to do something that was not within the same scope. But here you have a situation where the FMP studied the methods that would be used, the tools that would be used, the specific sites at which these points would occur, and here the small changes that the Park Service implemented, I would say they are very important, but they nonetheless are not going to have a major environmental impact, that those small changes are really commensurate with the scope of what was studied in the FMP. And can I ask you to respond then to the plaintiff's description that there was no analysis of the environmental impact at these sites? Do you just disagree with that factually? I think we just flatly disagree with that. I mean, there's an 812-page environmental impact statement that goes through tools, techniques, zones, targets, and talks about exactly these sites. It labels the exact intersections at which thinning would occur within 200 feet of road center lines. I mean, I don't know if it's exact to the inch, but it's pretty close. I mean, I would just disagree with that characterization. I just wanted to back up just for a little bit. Is there a distinction between change or an amendment to a plan? Do you see any distinction there? I don't think so. I mean, I think one thing that change does is, you know, I mean, I think amendment maybe has a more formalistic, legalistic sort of connotation, and I think change suggests that it doesn't need to be construed so narrowly, that sort of it's a more practical approach rather than, you know, something that strictly is sort of an amendment you tag on. But I don't, you know, there's been no argument about this case that it might satisfy one or the other, and I think the best reading is just to read them together and to say, when you do something that is consistent with an approved plan and commensurate with the scope of the approved plan and do the work as the Park Service did here to confirm that there would be no or only minimal environmental impact, then you've satisfied what the categorical exclusion requires. I mean, the heart of the analysis, unless you're dealing with some real outlier, is the second part, the cause no or only minimal environmental. Right. Yes, and that is, I guess, that is a third limiting principle that is certainly an important one, that the impact has to be minimal. How about the scientific controversy? Can you explain why there's no scientific controversy with thinning trees and fire management? So I'm happy to, and I think I have maybe three separate arguments, but first what I would say is this really is an attempt to collaterally attack the 2004 fire management plan here. I mean, what we're talking about here is methods that were extensively studied and extensively reviewed, and they were determined necessary to protect the park in 2004. And it's not really, you know, these projects aren't changing the ballgame. They're relying on analysis that was previously done and previously studied already. The second point is that there is a real conflation, I think, of what these particular projects are doing. As Your Honor noted, one thing they're doing is preparing the way for prescribed fire, and that is, I think, outside of whatever controversy has been suggested exists here. I mean, really, they're relying on a scientist who has views about commercial logging in the heart of forests. And what we're talking about is really something different. It is preparing the way for prescribed fire. It is preparing road corridors so that firefighters have defensible lines where there's less fuel. And there is no dispute in the firefighting community that they would rather be stationed on a road that had been treated rather than a road that had not been treated. I guess, Mike, because the record does seem to suggest that there might be a scientific debate about the effects or efficacy of thinning trees as fire management strategies. And so my question is, why did the Park Service not address the possible scientific controversy in the exclusion packets as extraordinary circumstances? Well, they did indicate that they considered extraordinary circumstances, and I think the fact is the Park Service, as the declarations here show, were well aware of this science. This wasn't, you know, a surprise that there were scientists who had the viewpoints that the other side has put in. And the Park Service reasonably concluded here that given the specific nature of the projects that were at issue, given what had already been studied, that there was no significant controversy related to actually what the categorical exclusions were approving in this case. And, you know, and one thing I'll say is that this case is in an unusual posture, too, right? This is an appeal of a preliminary injunction on an incomplete administrative record, and I think very well that could be the sort of thing that the district court would reach in the merits on a full administrative record down the road. But I think it would be almost premature to really address whether or not that exists at this stage. Can I ask, when we think about whether there's controversy, do we ask in general whether there's controversy about thinning before prescribed burns, or do we ask if there's controversy about the difference between 12 and 20? Like, are we only asking whether the controversy is about the change and we just take the old thing as given, or do we look at the whole topic? Yeah, I think the better answer is probably that you look at the change, because the other stuff has already been studied. The other stuff already has an environmental impact statement where it was fully vetted, and so really you're looking at the change. But I think more fundamentally, also, it's really always going to be a fact-specific and circumstance-specific inquiry. Whether or not there is a controversy, you know, whether a project is highly controversial is going to be about that project's very specific characteristics here. I mean, it couldn't be that anything going to the 2004 is irrelevant because you could have, hypothetically, at least a circumstance where somebody says, this was the science in 2004, we're in 2023 now, and as everybody has admitted, the science has materially changed, right? I mean, the science – I'm not saying that happened here, but that could theoretically be the case, right? It could theoretically be the case, and I think the question then is what is the nature of the actual projects and what is being approved and what is being looked at? And ultimately here you have categorical exclusion packages where I believe the Park Service did a really robust job in going above and beyond the kinds of things they had to consider, but they didn't – It didn't really provide much reasoning when it comes to this. I mean, if you look at ER-628 and ER-651, and it seems like from our case law it says, where there is substantial evidence in the record that exceptions to the categorical exclusion may apply, the agency must at least, at the very least, explain why the action does not fall within one of the exceptions. And I'm just wondering if this is enough. You make a point that this is at the preliminary injunction stage, but I just – that's my main question for you. Yeah, and I would say this is one of those instances where the declaration fills in whatever gaps you might think exist. I mean, I think our top-line position is that when you look at the fire management plan and the categorical exclusion package is that those are sort of sufficient on all counts. But even if not, I mean, when an agency does a categorical exclusion, the entire purpose is to reduce paperwork and reduce delay, and I think this project shows the urgency of moving ahead. And so in those situations, it makes sense that at least sometimes that there would be some extra record evidence to further elaborate the process and the analysis that went into those conclusions. Judge Bennett asked this question about, like, what happens if the science is changed. And I'm wondering, it seems like the exclusion for this amendment idea kind of assumes that we take something as the baseline and we're amending it, right? Is there a point at which the baseline – I mean, I'm not sure this is really a challenge to the baseline, but at some point do you need to do a new programmatic thing because 2004 is too long ago? Yeah, I mean, at some point, yes, that would have to happen. I mean, the 2004 FMP was a document that projected a lot of things over a 20-year time horizon, which we're still within. But I would also say, you know, they have not challenged the 2004 FMP. This is a challenge to the categorical exclusions and how those categorical exclusions were applied. And if we're looking at sort of the validity or the vitality of the 2004 FMP, among other things, there would be a different record before this Court, and at least at this stage in the review of a preliminary injunction on an incomplete record going to categorical exclusions, I think it goes a bit far afield to sort of question the vitality of that document that hasn't been challenged in this proceeding. Can you distinguish BARC? I just wanted you to distinguish BARC before you concluded. Yeah, so BARC, the Court several times in its opinion was very clear that what it was considering was variable density thinning, which is a kind of commercial logging technique where commercial loggers will go into the heart of forest and thin trees of all diameters, including the very largest trees, for the purpose of commercially obtaining the most valuable timber and to stimulate future timber growth. That is entirely different than what the Park Service, with its single-minded focus here on protecting Yosemite, is doing when it's thinning relatively smaller, younger trees for the entire purpose of protecting the largest and the most iconic trees. This is not commercial in any way. And, you know, the Institute has kept saying, I think, throughout its briefs, that there's a commercial aspect, and that is flatly untrue. The project is entirely to protect these areas. There is a very small amount of money that's earned from these projects. You know, the wood has to be hauled out, and rather than just throw it away, they find productive uses for it, which bring in a very small amount of money that is entirely used to offset these project costs. And I think that is really, like, the heart of the distinction with BARC. If the court has any further questions, I'm happy to answer. Thank you. Again, we'd ask the court to affirm. Thank you. I'd like to start with BARC. The court made it clear in BARC that the commercial aspect had nothing to do with their decision. In fact, they said the stated primary purpose of the project is to reduce the risk of wildfires. So that's what was going on. And variable thinning was the specific technique at issue there, but the science they're quoting, and they quote it, is clearly talking about reducing using large trees, not just the specific label that you put on it. It's a scientific controversy. And going to Judge Bennett's question, there has been a change in the science, and that's really what this is about. And, you know, at this point we actually have seen the record down below. And one document that we saw through our FOIA requests is, and by the way, we actually did say down below that the EIS, the 2004 EIS, is stale because of this science. We didn't have that EIS until after we filed our complaint. That EIS is stale. The science that the Forest Service itself is citing is all post-2004, but that's never been subjected to a NEPA process, and that's really what we're asking for here, is a chance to have an actual NEPA process about this remarkable change in the science. Thank you very much. Thank you both. The case of Earth Island Institute versus Cecily Muldoon is submitted. I want to thank you both for your oral argument presentations here today. Thank you so much. We are adjourned for today. Thank you.
judges: MURGUIA, FRIEDLAND, BENNETT